IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| KAMI WAILEHUA, | Civil No. 22-00280 MWJS-KJM |
| Plaintiff, | ORDER DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT |
| vs. | |
| UPS SUPPLY CHAIN SOLUTIONS, INC., | |
| Defendant. | |

## **INTRODUCTION**

In this disability discrimination action, Plaintiff Kami Wailehua alleges she was unlawfully denied reasonable accommodations and terminated from her employment in violation of the Americans with Disabilities Act (ADA). Defendant UPS Supply Chain Solutions, Inc. (UPS) now moves for summary judgment, contending that there are no genuine disputes of material fact and that it is entitled to prevail as a matter of law.

UPS has made strong arguments about the interactive process and the accommodations it provided to Wailehua. And UPS persuasively argues that the COVID-19 pandemic affected its operations, just as it did the operations of many other businesses in Hawaiʻi. These arguments may serve UPS well before a jury. But based on the record before it, the Court concludes that genuine disputes of

material fact remain regarding Wailehua's prima facie disability discrimination case. Furthermore, genuine disputes of material fact remain regarding whether UPS terminated Wailehua for a legitimate, nondiscriminatory reason. Because the Court cannot say that UPS should prevail as a matter of law, the Court DENIES UPS's motion.

## BACKGROUND

### A.    Wailehua's Termination and ADA Claim

Wailehua's complaint alleges a single claim of disability discrimination in violation of the ADA. ECF No. 1, at PageID.4-6. The claim arises out of Wailehua's termination from employment with UPS effective September 30, 2020. *Id.* at PageID.2.

From 1994 to 2020, Wailehua was assigned to work as a Center Freight Operations Specialist II for UPS in its Honolulu Service Center, located near the Honolulu International Airport. *Id.*; ECF No. 32, at PageID.125 (Def.'s Concise Statement of Facts (CSF) ¶ 1). Wailehua's responsibilities included quoting ocean and air freight rates and dealing with freight forwarding agents. ECF No. 32, at PageID.125 (¶ 2). In 2014 and 2015, Wailehua sustained work-related injuries to her arms, hands, neck, and upper back. *Id.* (¶ 5); ECF No. 34-1, at PageID.349 (Decl. of Pl. ¶ 3). As a result, she took intermittent medical leave between 2014 and 2020. ECF No. 1, at PageID.3 (¶¶ 10-12). On December 3, 2018, Wailehua

went on leave again, and she has not yet returned to work.  ECF No. 32, at PageID.125 (¶ 7).

UPS has a twelve-month leave policy, "which provides that employees who are absent from their regular occupation for 12 months . . . will be administratively terminated regardless of their status on short- or long-term disability."  ECF No. 32-4, at PageID.185.  Prior to terminating Wailehua, on August 21, 2019, the UPS Human Resources Service Center sent her a "9 month letter" informing her of its maximum leave policy and stating that she had been out on worker's compensation since December 3, 2018, and that she should contact them if she had an ADA-covered disability.  ECF No. 32, at PageID.125-26 (¶ 8).  In the fall of 2019, Wailehua reached out to Gerald Yee, the Area Human Resources Manager for UPS, and asked whether she would be terminated if she did not return to work by December 3, 2019.  ECF No. 32-6, at PageID.296; *see also* ECF No. 32-9, at PageID.303.  Yee did not directly respond to that inquiry, but he discussed the letter with Wailehua via email and encouraged her to participate in the ADA interactive process to explore potential reasonable accommodations.  ECF No. 32-6, at PageID.296; ECF No. 32-8, at PageID.301.

There is no dispute that Wailehua and UPS did engage in some interactive process before Wailehua's termination.  Although Wailehua's twelve-month leave term expired on December 3, 2019, UPS did not immediately apply the policy.

Instead, on January 16, 2020, the parties participated in their first interactive process meeting, during which they discussed potential accommodations for Wailehua, who, at that time, could work no more than four hours per day.  ECF No. 32, at PageID.127 (¶¶ 16-17).  Proposed accommodations included modified work hours of four hours per day for one week, six hours per day the following week, eight hours per day the next week, and normal work hours thereafter.[1]  *Id.* (¶ 16).  At that time, the essential functions of the Specialist II position included working full time, working in a seated position on the computer most of the day, and "intermittent" walking.  ECF No. 32-12, at PageID.326.  Following the first interactive process meeting, on February 5, 2020, UPS determined Wailehua was not qualified to perform the essential functions of the position due to her restriction on full-time work.  ECF No. 32, at PageID.127 (¶ 17).

Shortly thereafter, while the interactive process was still ongoing, UPS changed the essential functions of the Specialist II position.  In February and March of 2020, UPS sustained business losses due to the COVID-19 pandemic, resulting in significant personnel reductions in the UPS center where Wailehua worked.  *Id.* (¶ 19).  Wailehua's position was not eliminated but required, for the

---

[1]     The other potential accommodations discussed were an ergonomic chair and sit and stand desk; an office position in Honolulu; "occasional" standing, walking, and bending at the waist; no torso/spine twist or climbing ladders; and a ten-pound lift restriction.  ECF No. 32, at PageID.127 (¶ 16).

first time, "physical presence" at the center to check freight and the ability to "constantly" walk around the facility and between the center's warehouse and airport hub. *Id.* at PageID.127-28 (¶¶ 20-21). In practical terms, this meant that a Specialist II would now be required to walk between 67 and 100 percent of the workday—or from as few as five hours and 22 minutes a day to as many as eight hours a day.

UPS still held off on applying its leave policy for a time. And between February and August of 2020, Yee and Wailehua touched base periodically to review alternative job opportunities that could accommodate her restrictions. *Id.* at PageID.128 (¶ 22). Wailehua informed Yee that she was willing to accept a transfer or reassignment, but only to Honolulu airport and only to another full-time position. ECF No. 32-2, at PageID.138; ECF 32-4, at PageID.217. The parties found no vacant positions that could accommodate Wailehua's restrictions. ECF No. 32-2, at PageID.139.

In an effort to return to her Specialist II position, Wailehua devoted herself to occupational physical therapy. And in July of 2020, Wailehua underwent a Functional Capacity Examination (FCE). The results indicated a substantial improvement: despite having previously been unable to work full time, Wailehua had now improved to the point that she could again work eight hours a day, five days a week. ECF No. 32-4, at PageID.209. She retained some restrictions due to

her disability, however, including on "constant" walking—she could only perform "frequent" walking, that is, 34 to 66 percent of a workday—and on lifting more than fifteen pounds. *Id.* at PageID.208, 212.  Because of the walking restriction, the FCE results indicated that according to the job requirements provided by UPS, Wailehua was not qualified for "full time, full duty" work.[2] *Id.* at PageID.208.

In concrete terms, this meant that Wailehua could not return to her Specialist II position because she could only walk between 2 hours and 43 minutes (at minimum) and 5 hours and 17 minutes (at most) per day—and because UPS required daily walking of between 5 hours and 22 minutes (at minimum) and 8 hours (at most).  But the FCE did not indicate where within this range Wailehua fell.  Nor did UPS ever indicate where within this broad range the walking requirements of the position fell.  The record, at this summary judgment stage, does not answer these questions.  Accordingly, as far as the record currently shows, it is possible that Wailehua was precluded from returning to her position because she could not manage to walk just five more minutes a day.  And because "constant" walking was a new work requirement imposed during the COVID-19

---

[2]      To be precise, the FCE results also found Wailehua was not capable of working full time in the Specialist II position based on an assumption that the position would require her to work nine to ten hours per day, for five days a week. ECF No. 32-4, at PageID.209.  But at the hearing on UPS's motion, counsel for UPS conceded that on the current record, the Specialist II position required only eight hours of work per day, which Wailehua's FCE results found she could do.

pandemic—and after Wailehua had gone out on leave—Wailehua would not have been in a position to answer those questions herself.

The record permits the reasonable inference that UPS did not make efforts to answer these questions, either. To be sure, informed by Wailehua's FCE, the parties engaged in a second interactive process meeting on September 9, 2020, during which they again discussed possible accommodations. ECF No. 32, at PageID.128-29 (¶ 29). As laid out in an Accommodation Checklist dated September 9, 2020—the authenticity of which is disputed—proposed accommodations included modified work hours of six hours per day one week and then eight hours moving forward, as well as working from home with ten-minute breaks so that Wailehua could use a "traction device" as needed. ECF No. 40-3, at PageID.440. In that same checklist, UPS allegedly indicated that means existed to accommodate the modified work hours, but not the remote work. *Id.* But there is no indication—in this checklist or anywhere else in the summary judgment record—that the parties ever discussed the "constant" walking requirement, how far short of it Wailehua fell, or whether there would be any reasonable way to accommodate her if she did not fall short by much.

Instead of implementing any of the accommodations that had been discussed, UPS terminated Wailehua shortly after the second meeting. The parties dispute why and how this occurred. According to UPS, it determined that

7

Wailehua was unable to perform the post-March 2020 essential functions of the Specialist II position because of her alleged need to work from home and her inability to perform the "constant" walking requirement.  ECF No. 32, at PageID.129 (¶ 30).  But according to Wailehua, Yee abruptly ended the interactive process by calling Wailehua on September 21, 2020, to tell her that her position had been eliminated due to COVID-19.  ECF No. 34-1, at PageID.351 (¶ 16).[3] Wailehua also disputes that she needed to work from home, and contends that she could have returned to the office full time if required to do so.  *Id.* at PageID.352 (¶ 21).  In any case, the parties agree that on October 6, 2020, UPS sent Wailehua a letter informing her that she was being administratively terminated effective September 30, 2020, pursuant to UPS's twelve-month leave policy.  ECF No. 32, at PageID.129 (Def.'s CSF ¶ 32); ECF No. 34, at PageID.345 (Pl.'s CSF ¶ 32) (undisputed).

### B.   UPS's Motion for Summary Judgment

UPS now seeks summary judgment.  UPS asserts that Wailehua cannot establish a prima facie disability discrimination case because she cannot show that she is a "qualified individual" under the meaning of the ADA, nor can she show that UPS took adverse employment action against her because of her disability.

---

[3]   Yee does not specifically recall that phone call and denies ever telling Wailehua that the Specialist II position had been eliminated.  ECF No. 40-2, at PageID.434-35 (Supp. Decl. of Yee ¶¶ 2-3).

And, UPS contends, even if Wailehua made a sufficient prima facie showing of unlawful termination, her claim still cannot survive summary judgment because UPS had a legitimate, non-discriminatory reason for terminating her, namely, that she exceeded UPS's maximum leave policy and no reasonable accommodation was available.  Finally, UPS points out that Wailehua has made no showing that this explanation for her termination is mere pretext.

In opposition, Wailehua maintains that summary judgment is not warranted because genuine disputes of material fact exist regarding (1) whether UPS fulfilled its obligation to engage in the interactive process; and (2) whether UPS terminated her for legitimate, nondiscriminatory reasons or because of her disability.

The Court held a hearing on UPS's motion for summary judgment on April 12, 2024.  ECF No. 44.

## SUMMARY JUDGMENT STANDARD

Summary judgment is warranted where a movant shows there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  The party seeking summary judgment bears the initial burden of demonstrating the absence of any genuine disputes of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986).

If the moving party makes that showing, the burden then shifts to the nonmoving party to "come forward with specific facts showing that there is a

genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (cleaned up).  But as the Ninth Circuit has explained, "the burden on the nonmoving party is not a heavy one; the nonmoving party simply is required to show specific facts, as opposed to general allegations, that present a genuine issue worthy of trial." *Dark v. Curry County*, 451 F.3d 1078, 1082 n.2 (9th Cir. 2006) (cleaned up).

In making that assessment, the Court must view the facts in the light most favorable to the nonmoving party.  *Matsushita Elec.*, 475 U.S. at 587.  And if "the nonmoving party produces direct evidence of a material fact, the court may not assess the credibility of this evidence nor weigh against it any conflicting evidence presented by the moving party." *T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 631 (9th Cir. 1987).  Rather, the "nonmoving party's evidence must be taken as true." *Id.*  Furthermore, the Court must draw all reasonable inferences in the nonmoving party's favor—and those inferences might demonstrate a genuine dispute of material fact even where the nonmoving party has not offered direct proof.  *See id.*

## DISCUSSION

The ADA prohibits covered employers from discriminating "against a qualified individual on the basis of disability in regard to" certain employment actions.  42 U.S.C. § 12112(a).  Discrimination under the ADA can include failing

to provide reasonable accommodations to an employee, *see id.* § 12112(b)(5)(A), and terminating an employee on the basis of their disability, *see id.* § 12112(a).[4]

For purposes of UPS's motion for summary judgment, both parties accept that a burden-shifting scheme applies to Wailehua's unlawful termination claim, under which she must first establish her prima facie case of discrimination. *Raytheon Co. v. Hernandez*, 540 U.S. 44, 49 n.3 (2003) (citing *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)).  The burden then shifts to UPS to articulate a legitimate, nondiscriminatory reason for its action.  *Id.*  And if UPS "meets this burden, the presumption of intentional discrimination disappears," but Wailehua can still prove disparate treatment by other means, such as by "offering evidence demonstrating that the employer's explanation is pretextual." *Id.*

UPS contends that Wailehua has not offered sufficient evidence to support a prima facie case of disability discrimination, and that UPS fulfilled its obligation to engage in the interactive process as a matter of law.  In addition, UPS argues that it

---

[4]    "[C]onceptually, disparate treatment claims and failure to accommodate claims under the ADA are distinct.  However, in a case like this one, where the employer has allegedly failed to accommodate an employee and that failure to accommodate led to the employee's eventual termination, the two claims rise and fall together."  *Braa v. Costco Wholesale Corp.*, No. 21-cv-00684, 2023 WL 5039912, at *8 (D. Or. Aug. 8, 2023) (citation omitted); *see also Humphrey v. Mem'l Hosps. Ass'n*, 239 F.3d 1128, 1139 (9th Cir. 2001) ("Often the two claims are, from a practical standpoint, the same.  For the consequence of the failure to accommodate is, as here, frequently an unlawful termination.").

has offered evidence of a legitimate, nondiscriminatory reason for terminating Wailehua, and Wailehua has not offered any evidence demonstrating that the explanation is pretextual.  The Court takes up each of these arguments in turn.

**A.    Genuine Disputes of Fact Remain Regarding Wailehua's Prima Facie Case of Disability Discrimination**

To state a prima facie case under the ADA, Wailehua must show that (1) she is a disabled person within the meaning of the ADA; (2) she is a qualified individual, meaning she can perform the essential functions of her job; and (3) she suffered an adverse employment action because of her disability.  *Nunes v. Wal-Mart Stores*, 164 F.3d 1243, 1246 (9th Cir. 1999).

It is undisputed that Wailehua is disabled within the meaning of the ADA. But UPS asserts that Wailehua has not made a sufficient showing of the second and third elements of disability discrimination.  ECF No. 31-1, at PageID.109.

**1.    A Reasonable Factfinder Could Conclude That Wailehua Is a Qualified Individual**

Under the ADA, a "qualified individual" is "an individual who, *with or without* reasonable accommodation, can perform the essential functions of the employment position."  42 U.S.C. § 12111(8) (emphasis added).  "Essential functions" are the "fundamental job duties" of the position; they do not include "marginal functions."  29 C.F.R. § 1630.2(n)(1) (2012).  "If a disabled person cannot perform a job's 'essential functions' (even with a reasonable

accommodation), then the ADA's employment protections do not apply.  If, on the other hand, a person can perform a job's essential functions, and therefore is a qualified individual, then the ADA prohibits discrimination with respect to the employment actions outlined in 42 U.S.C. § 12112(a)."  *Bates v. United Parcel Serv., Inc.*, 511 F.3d 974, 989 (9th Cir. 2007) (cleaned up).

a.  The initial question is whether Wailehua could return to her Specialist II position *without* reasonable accommodations.  *See Dark*, 451 F.3d at 1086.  And at this stage, Wailehua accepts that she could not do so.  Among the essential functions of the Specialist II position is the requirement of "constant" walking.  Wailehua does not dispute that this is an essential function of the position (post-2020, at least)[5] or that she is unable to perform it.  She concedes, as her July 2020 FCE found, that she could only walk "frequently."

---

[5]      At the hearing on UPS's motion, Wailehua's counsel conceded that Wailehua has no personal knowledge of the post-2020 essential functions of the Specialist II position.  *See also* ECF No. 32, at PageID.127-28 (Def.'s CSF ¶¶ 15 & 21) (listing the essential functions of the Specialist II position); ECF No. 34, at PageID.343 (Pl.'s CSF ¶¶ 15 & 21) (undisputed).

Wailehua does dispute that the essential functions of the Specialist II position ever involved any lifting.  ECF No. 35, at PageID.384.  But as UPS points out, UPS never took the position that the Specialist II position required lifting; rather, it cited her lift restriction as a reason it was unable to find an alternative position for her.  ECF No. 39, at PageID.416 n.1.

But this alone does not answer the question of whether Wailehua is a qualified individual under the ADA, for she contends that she could have returned to her Specialist II position *with* accommodations.

Under the ADA, upon adequate notice of a need for accommodation, employers are required to provide "reasonable accommodations" for otherwise qualified disabled employees unless the employer "can demonstrate that the accommodation would impose an undue hardship on the operation of [its] business." 42 U.S.C. § 12112(b)(5)(A); *see also Snapp v. United Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018). Wailehua "has the burden of showing the existence of a reasonable accommodation that would have enabled [her] to perform the essential functions" of her position. *Dark*, 451 F.3d at 1088. To avoid summary judgment, however, she "need only show that an accommodation seems reasonable on its face, i.e., ordinarily or in the run of cases." *Id.* (cleaned up) (quoting *U.S. Airways, Inc. v. Barnett*, 535 U.S. 391, 401-02 (2002)).

To facilitate the implementation of reasonable accommodations, "[o]nce an employer becomes aware of the need for accommodation," they have an affirmative duty under the ADA to "engage in an interactive process." *Humphrey*, 239 F.3d at 1137. In that process, the employer must, in good faith, "consider the particular circumstances of an employee's case to determine whether and under what circumstances an employee may be able to return to work." *Chan v. Wells*

*Fargo Advisors, LLC*, 124 F. Supp. 3d 1045, 1061 (D. Haw. 2015) (citing *Dark*, 451 F.3d at 1090). "Employers, who fail to engage in the interactive process in good faith, face liability for the remedies imposed by the statute if a reasonable accommodation would have been possible." *Humphrey*, 239 F.3d at 1137-38. And, at the summary judgment stage, if an employer did not engage in the interactive process in good faith, "summary judgment is available to the employer only when a reasonable factfinder '*must* conclude that there would in any event have been no reasonable accommodation available.'" *Chan*, 124 F. Supp. 3d at 1062 (quoting *Dark*, 451 F.3d at 1088).

The sufficiency of the interactive process is at the heart of the parties' dispute here. UPS, for its part, contends that it engaged in the interactive process in good faith and thereby discharged its obligation to accommodate Wailehua's restrictions. And the record does show that UPS, in many ways, demonstrated significant commendable efforts during the interactive process. It held off on applying its maximum leave policy for nearly an additional ten months after the twelve-month mark, and Yee sought alternative job positions for Wailehua for six months and met with her twice to discuss possible accommodations for her.

Nonetheless, the record also supports the inference that just after Wailehua showed significant health improvements, UPS terminated her. Wailehua's July 2020 FCE results, which UPS acknowledged it received a copy of, indicated that

she could work full time again.  And she had only one remaining restriction

relevant to the Specialist II position:  she could only walk "frequently," or between

34 and 66 percent of the day, instead of "constantly," or between 67 and 100

percent of the day.  But there is no evidence that UPS explored possible

accommodations of that sole remaining restriction before terminating Wailehua.

Indeed, at the hearing on UPS's motion, UPS indicated it was not even sure

how close Wailehua was to being able to meet the "constant" walking requirement.

UPS acknowledged that the gap between her abilities and the position's

requirements could have been as trifling as one percent—the difference between

the high end of "frequent" walking (34 to 66 percent) and the low end of

"constant" walking (67 to 100 percent).  This means that, as far as the record

shows, it is possible Wailehua was precluded from returning to her job because she

could not walk for another one percent of the workday, or an extra five minutes.

The Court therefore finds that a jury question remains regarding whether more

discussions would have been productive and whether they ultimately would have

enabled Wailehua to perform the essential functions of the position; put differently,

a reasonable jury could find that UPS did not sufficiently engage in the interactive

process before terminating her.  *See, e.g.*, *Barnett v. U.S. Air, Inc.*, 228 F.3d 1105,

1116-17 (9th Cir. 2000) (stating that the employer failed to engage in the

interactive process in good faith when it rejected the employee's proposed

accommodations and offered no practical alternatives), *overruled on other grounds by* 535 U.S. 391 (2002).

The Court also cannot conclude that no reasonable accommodation existed as a matter of law.  Wailehua asserts that UPS should have provided her with additional medical leave as an accommodation—which would have allowed further time to explore a reasonable accommodation for the "constant" walking requirement, or at least allowed Wailehua additional time to further recover through her continued efforts at occupational physical therapy.  ECF No. 35, at PageID.390.  It is well-settled that additional medical leave can be a reasonable accommodation.  *See Humphrey*, 239 F.3d at 1135-36 ("[W]here a leave of absence would reasonably accommodate an employee's disability and permit [her], upon [her] return, to perform the essential functions of the job, that employee is otherwise qualified under the ADA."); *see also* 29 C.F.R. Pt. 1630, App. § 1630.2(o) (stating that a reasonable accommodation "could include permitting the use of accrued paid leave or providing additional unpaid leave for necessary treatment").  And because employers have a continuing duty to accommodate that does not cut off after one effort, *Humphrey*, 239 F.3d at 1138, even multiple extensions of medical leave can constitute a reasonable accommodation, *Nunes*, 164 F.3d at 1247.  "Determining whether a proposed accommodation . . . is

reasonable, including whether it imposes an undue hardship on the employer,

requires a fact-specific, individualized inquiry." *Id.*

UPS argues that any additional medical leave would not have been a

reasonable accommodation as a matter of law because it would have been

indefinite.  ECF No. 39, at PageID.421.  It is true that "recovery time of

unspecified duration *may* not be a reasonable accommodation (primarily where the

employee will not be able to return to [their] former position and cannot state when

and under what conditions [they] could return to work at all)."  *Dark*, 461 F.3d at

1090 (emphasis added).  But "the ADA does not require an employee to show that

a leave of absence is certain or even *likely* to be successful to prove that it is a

reasonable accommodation."  *Humphrey*, 239 F.3d at 1136 (emphasis added).

Here, a reasonable factfinder could conclude that UPS failed to consider whether a

further extension of medical leave—with some defined end point—would have

been a reasonable accommodation under the particular circumstances of

Wailehua's case.  Moreover, apart from noting that it should not have had to

provide *indefinite* leave, UPS does not argue that providing Wailehua with

additional medical leave would have posed an undue hardship.  And Wailehua's

significant improvement during the medical leave leading up to her termination—

coupled with the fact that, at this stage, the record does not foreclose the possibility

that Wailehua was already within striking distance of meeting the "constant"

18

walking requirement—are enough to show that it was at least possible that additional leave could have been beneficial.[6]  The Court therefore concludes that a genuine dispute exists as to the reasonableness of additional medical leave, as well as whether any other reasonable accommodations might, if considered, have enabled Wailehua to perform the "constant" walking requirement.  *See Barnett*, 228 F.3d at 1115-16 ("[In determining whether] the employee would have been able to perform the job with accommodations . . . the jury is entitled to bear in mind that had the employer participated [in the interactive process] in good faith, there may have been other, unmentioned possible accommodations." (quoting *Taylor v. Phoenixville Sch. Dist.*, 184 F.3d 296, 317-18 (3rd Cir. 1999))).

In reaching this conclusion, the Court is mindful that the Ninth Circuit has instructed district courts to exercise caution in granting summary judgment in ADA discrimination cases—at least when, as here, there are factual questions

---

[6]     To be sure, it is undisputed that on August 24, 2020, Wailehua's treating physician—Dr. DiConstanzo—noted that Wailehua's restrictions were "permanent."  ECF No. 32-4, at PageID.277; *see also* ECF No. 32, at PageID.128 (Def.'s CSF ¶ 26); ECF No. 34, at PageID.344 (Pl.'s CSF ¶ 26) (undisputed).  But several of Dr. DiConstanzo's prior work status reports also appear to state that Wailehua had "permanent" restrictions—including those dating back to 2015—and yet, Wailehua's restrictions have changed over time.  *See, e.g.*, ECF No. 32-4, at PageID.248, 251, 254, 257, 260, 263, 266, 271.  Accordingly, Dr. DiConstanzo's finding of "permanent" restrictions does not necessitate a finding, as a matter of law, that Wailehua could not further improve (particularly since it is unclear from the record how much she needed to improve to perform "constant" walking), nor that additional medical leave was not a reasonable accommodation.

19

relating to the availability of reasonable accommodations.  Take *Nunes v. Wal-Mart*, for example.  In that case, the district court found that the employee was not a qualified individual under the ADA and granted summary judgment to the employer, *Nunes*, 164 F.3d at 1246, but the Ninth Circuit reversed, *id.* at 1249. The employee suffered from a fainting disorder, and had several fainting episodes while at work.  *Id.* at 1245.  As a result, she took medical leave for treatment, which was extended until Wal-Mart terminated her around seven months later.  *Id.* at 1245-46.  In granting summary judgment to Wal-Mart, the district court relied in part on the employee's doctors' certifications that she could not perform the essential functions of her position.  *Id.* at 1246-47.  But the Ninth Circuit held that genuine disputes of fact remained regarding whether additional medical leave was a reasonable accommodation, or whether it would impose an undue hardship on the employer.  *Id.* at 1247.

Or consider *Dark v. Curry County*.  In that case, too, the district court had granted summary judgment to the County employer.  *Dark*, 451 F.3d at 1082.  The County argued that the employee, who had epilepsy and had suffered a seizure while operating heavy equipment—an essential function of the job—was legitimately terminated for misconduct or for failure to meet legitimate job expectations.  *Id.* at 1081-83.  But the Ninth Circuit reversed, holding in part that it could not find that the employee was not qualified for his position as a matter of

law because the County had failed to consider whether additional medical leave would have been a reasonable accommodation under the particular circumstances of the employee's case. *Id.* at 1090. And because there was evidence that with new medication, after a transition period, the employee could have operated machinery safely, a genuine dispute of material fact remained as to whether additional leave time would have enabled the employee to perform the essential functions of his position. *Id.* at 1088-90.

UPS attempts to distinguish this case from *Dark* based on the fact that, here, UPS did engage in an interactive process. It is true that the employer in *Dark* did not engage in similarly commendable efforts. But as explained above, an employer has an affirmative duty to not just initiate the interactive process, but to continue engaging in that process in good faith. *See Humphrey*, 239 F.3d at 1138. Because a reasonable factfinder could conclude that UPS terminated Wailehua without adequately discussing possible accommodations for the "constant" walking requirement, there is a genuine dispute as to whether UPS sufficiently engaged in the interactive process. It follows that, as in *Dark* and *Nunes*, triable issues of fact remain regarding whether Wailehua could perform the essential functions of the Specialist II position with accommodations.

b. UPS offers a separate argument for why Wailehua was not a qualified individual: even if there existed some possible accommodation of her walking

restriction, Wailehua was unqualified for the separate reason that she could not work full time in the office.  Here again, Wailehua does not dispute that full-time work hours and physical presence were essential functions of the Specialist II position.  But Wailehua argues that she could meet these requirements.

To be sure, Wailehua concedes that she could not have worked in the office full time before July 2020.  But she contends that as a result of her commitment to occupational therapy through 2019 and 2020, her conditions improved to the point that by July 2020, she could work in the office full time.  As corroborating evidence, she points to her July 2020 FCE results.  And she represents, in a declaration submitted in connection with her opposition to UPS's summary judgment motion, that her request to work from home was merely that—a request—and not a work restriction.  ECF No. 34-1, at PageID.352 (¶ 21).

UPS, for its part, does not dispute that the FCE can be read to authorize Wailehua working a full-time schedule, but it nonetheless contends that the Court should disregard Wailehua's declaration and instead hold her to her prior representations that she could not work more than four hours per day in the office.  In particular, UPS notes that during the discovery process in this case, Wailehua made statements under oath that, on their face, suggest she could not work full time.  For instance, in her answers to interrogatories dated February 22, 2023, Wailehua wrote under oath, "*Per the [FCE]*, my work restrictions were that *I could*

*only work 4 hours per day*."  ECF No. 32-10, at PageID.307 (emphases added).

And in those same answers to interrogatories, Wailehua wrote that she believed she

"was subjected to disability discrimination when Defendant forced [her] to work

more than four (4) hours per day against [her treating physician's] orders."  *Id.*

Elsewhere in the answers to interrogatories, Wailehua wrote, again under oath,

"*Per the [FCE]*, my work restrictions were that I could only work 4 hours per day

*in the office* but w[as] allowed to perform the remaining hours from home as an

accommodation."  *Id.* at PageID.308 (emphases added).  Apart from the answers to

interrogatories, UPS points out that Wailehua made various requests to work from

home as an accommodation, including in email exchanges with Yee and in an

accommodation checklist.  *See, e.g.*, ECF No. 32-4, at PageID.214 ("Is working

full time from home an option for me? . . . I can be fully functional from home

. . . ."); *id.* at 216 ("I believe that I could carry out my work functions *if* able to

work from home." (emphasis added)).

    Wailehua undoubtedly would face cross-examination at trial based on these

answers to interrogatories and email exchanges, and a factfinder could ultimately

conclude that her testimony (to the extent it aligns with her declaration in claiming

that she could work in the office full time) is not credible.  But at the summary

judgment stage, the Court cannot make credibility determinations.  *T.W. Elec.*, 809

F.2d at 631.  Rather, Wailehua's declaration "must be taken as true."  *Id.*  And

taking the declaration as true, it raises a genuine dispute of material fact as to whether Wailehua could work in the office full time.

UPS rejoins that the Court should not take Wailehua's declaration as true, but instead should disregard it entirely.  In support, UPS points to the Ninth Circuit's statement that "a party cannot create an issue of fact by an affidavit contradicting [her] prior deposition testimony."  *Kennedy v. Allied Mut. Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991).  That is the appropriate course in some circumstances, but it is not the appropriate course here.  As the Ninth Circuit has cautioned, before applying the sanction of disregarding a party's affidavit, the Court must make the factual finding that the party's affidavit "flatly contradicts earlier testimony" and is a "sham" offered "in an attempt to 'create' an issue of fact and avoid summary judgment."  *Id.* at 267.  Where, instead, the contradictions are "the result of an honest discrepancy, a mistake, or the result of newly discovered evidence," then a nonmoving party's present declaration should not be disregarded in favor of prior testimony under oath.  *Id.*

And here, an honest discrepancy or mistake is evident on the face of Wailehua's answers to interrogatories.  In each of her answers, Wailehua purported to describe her July 2020 FCE as finding that she was unable to work in the office full time.  But as Wailehua's counsel pointed out at the hearing on UPS's motion, this is in fact a misreading of the FCE.  It is undisputed that Wailehua's FCE

24

results can be read to authorize her working a full-time schedule; moreover, nowhere do the FCE results indicate that any of Wailehua's work hours need to be performed from home.  The same is true of Wailehua's reference to her treating physician; that physician merely adopted the findings of the July 2020 FCE.  And as for her requests to work from home, Wailehua's declaration explains that she had only requested to work from home as a *possible* accommodation, but that she was willing to return to work at the office on a full-time basis.  ECF No. 34-1, at PageID.352 (¶ 21).  Under these circumstances, the Court cannot find that Wailehua has fabricated a false declaration to avoid summary judgment.  A fair reading of the record is that she misunderstood her FCE results—and that UPS misunderstood the nature of her requests to work from home—not that she made inconsistent statements.  The Court therefore cannot disregard Wailehua's declaration under the "sham affidavit" rule.

Based on Wailehua's FCE results and declaration, the Court declines to conclude that the record can only support a finding that Wailehua could not work full time in the office.  A reasonable factfinder could conclude that after the July 2020 FCE, Wailehua was able to perform the essential functions of a full-time work schedule and physical presence.[7]

---

[7]     In a separate effort to corroborate her willingness to return to work in the office full time, Wailehua produces an "Accommodation Checklist" dated

### 2.    A Reasonable Factfinder Could Conclude That Wailehua Was Terminated "Because of" Her Disability

UPS's next argument is that Wailehua has failed, as a matter of law, to meet the third element of her disability discrimination claim.  Under this element, an employee must show that their employer would not have terminated them "but for" their disability.  *Murray v. Mayo Clinic*, 934 F.3d 1101, 1105 (9th Cir. 2019); *see also Humphrey*, 239 F.3d at 1139 ("Unlike a simple failure to accommodate claim, an unlawful discharge claim requires a showing that the employer terminated the employee because of [her] disability.").

In opposition, Wailehua asserts that the enforcement of UPS's maximum leave policy, was, at its core, termination because of her disability, since she would not have been out on leave but for her disability.  Her argument is well taken.  In the Ninth Circuit, "conduct resulting from a disability is considered to be part of

_____

September 9, 2020, in which she allegedly proposed the accommodation of working six hours one week and then eight hours moving forward, and UPS indicated that means existed to accommodate that restriction.  ECF No. 34-3, at PageID.359.  UPS points out that during discovery, Wailehua refused to admit that the document was authentic.  ECF No. 32-5, at PageID.285 (denying the authenticity of the checklist in a request for admissions).  And so, UPS argues, the Court should not consider the checklist based on judicial estoppel.  ECF No. 39, at PageID.414.  In the alternative, UPS argues that Wailehua's declaration does not sufficiently authenticate the checklist because Wailehua does not have personal knowledge of whether Yee prepared the checklist after their meeting.  *Id.*  The Court need not resolve this dispute because even without the checklist, the other evidence in the record—namely, the FCE results and Wailehua's declaration—is sufficient to support a jury finding that Wailehua could have returned to the office full time.

the disability, rather than a separate basis for termination." *Humphrey*, 239 F.3d at 1139-40.  In light of that standard, the Court concludes that the record in this case is sufficient to allow a reasonable factfinder to conclude, at least as to Wailehua's prima facie case, that UPS terminated Wailehua "because of" her disability.

### B.   Genuine Disputes of Fact Remain Regarding Whether UPS Had a Legitimate, Nondiscriminatory Reason for Terminating Wailehua

As discussed above, genuine disputes of material fact remain as to Wailehua's prima facie case of disability discrimination.  Summary judgment therefore cannot be granted on the ground that Wailehua has failed to show a prima facie case.  But under the ADA, employers are permitted to terminate even qualified individuals if they do so for legitimate, nondiscriminatory reasons.  *See* 29 C.F.R. § 1630.15(a) (2011).  A legitimate, nondiscriminatory reason is "one that disclaims any reliance on the employee's disability in having taken the employment action." *Dark*, 451 F.3d at 1084 (cleaned up).  UPS argues that its application of its leave policy to Wailehua—at least where no reasonable accommodation was available—counts as such a reason, and that Wailehua has not offered sufficient evidence to show that reason to be mere pretext.

Here again, the Court concludes that there are genuine disputes of material fact.  To begin with, Wailehua's declaration represents that shortly before she was terminated, she was falsely told that the Specialist II position had been eliminated because of the COVID-19 pandemic.  *See supra* text accompanying note 3.  UPS

disputes ever having made that statement, *see supra* note 3, but at the summary judgment stage, the Court must accept that fact as true. *See T.W. Elec.*, 809 F.2d at 631. And a reasonable factfinder could conclude that if UPS did make a false statement to Wailehua about why it was terminating her, then UPS was motivated by more than a neutral application of its leave policy.

Furthermore, the Court cannot conclude as a matter of law that UPS's application of the leave policy—even if done with pure motives—was a legitimate, nondiscriminatory reason for termination. As discussed above, Wailehua's July 2020 FCE revealed that she had markedly improved and could now work full time. At this point, a reasonable factfinder could conclude that the only essential function of the Specialist II position that Wailehua could not meet was the "constant" walking requirement. But a reasonable factfinder could also conclude that UPS did not use the interactive process to assess how close Wailehua was to being capable of "constant" walking, or whether there were any reasonable accommodations that would allow her to fulfill that function. Recall that Wailehua undisputedly could perform "frequent" walking. Recall, too, that if Wailehua were capable of the high end of "frequent" walking (66 percent of the day), and if a Specialist II were only required to perform the low end of "constant" walking (67 percent of the day), a mere percentage—or *five minutes* of an eight-hour workday—would stand between Wailehua's abilities and the requirements of the

job.  The Court cannot say that applying the leave policy and terminating Wailehua

under these circumstances—without first assessing the distance between

Wailehua's capabilities and the requirements of the position, and without assessing

whether there were any reasonable accommodations that could bridge that

distance—qualifies as a legitimate, nondiscriminatory reason as a matter of law.

*See, e.g.*, *Fuqua v. United Parcel Serv., Inc.*, No. 16-cv-01193, 2017 WL 4516843,

at *20 (N.D. Cal. Oct. 10, 2017) (rejecting UPS's argument that enforcement of its

one-year maximum leave of absence policy necessarily shielded it from liability

because a reasonable jury could find that UPS did not let its employee return from

leave even though her disability could have been accommodated); *Braa*, 2023 WL

5039912, at *9 (rejecting Costco's argument that enforcement of its one-year

maximum leave policy was unrelated to the employee's disability where the

evidence suggested that the employee went on leave because Costco repeatedly

refused to accommodate the employee's scheduling restrictions).

Accordingly, the Court concludes that genuine disputes of material fact

remain regarding Wailehua's disability discrimination claim and that UPS is not

entitled to summary judgment.[8]

---

[8]     Because the Court cannot conclude, as a matter of law, that UPS terminated
Wailehua based on a legitimate, nondiscriminatory reason, the Court need not
resolve whether any such reason would have been pretextual under the
circumstances.

## <u>CONCLUSION</u>

For the foregoing reasons, Defendant UPS Supply Chain Solutions, Inc.'s

Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.

DATED:  May 3, 2024, at Honolulu, Hawai'i.



/s/ Micah W.J. Smith
_____
Micah W.J. Smith
United States District Judge

---

Civil No. 22-00280 MWJS-KJM; *Kami Wailehua v. UPS Supply Chain Solutions, Inc.*; ORDER
DENYING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

30